## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

WALTON CAMPBELL,
6036 Richmond Highway
Apartment 211
Alexandria, VA 22303

    PLAINTIFF,

v.                                                                                              Jury Trial Demanded

ROBERT M. SPEER, Acting Secretary,
    Department of the Army,
101 Army Pentagon
Washington, DC 20310-0101

    DEFENDANT.

## COMPLAINT

1. Plaintiff, Walton Campbell ("Plaintiff" or "Dr. Campbell"), brings this action against Defendant, Robert M. Speer, the Acting Secretary of the Department of the Army, under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq., and the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. § 621 et seq.

2. In 2005 through 2007, the Department of the Army discriminated against Dr. Campbell when it placed him on an indefinite, unpaid suspension for 852 days instead of assigning him unclassified duties that did not require a security clearance while the status of his security clearance was properly adjudicated by bodies of competent jurisdiction, as it had done in all prior instances of other employees whose clearances had been suspended or not yet approved.

### Jurisdiction and Venue

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1346; 42 U.S.C. §§ 2000e-5(f)(3), 2000e-16; and 29 U.S.C. 633a.

4. At all times relevant to this action, Defendant's principal office has been within the jurisdiction of the United States District Court for the District of Columbia. Thus, venue properly lies before this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e). Venue in this district is also proper under 42 U.S.C. § 2000e-5(f)(3).

5. Plaintiff has met all jurisdictional prerequisites for filing this action, and this action is authorized to be filed here pursuant to 5 U.S.C. § 7702 and 42 U.S.C. § 2000e–16(c).

## Parties

6. Plaintiff is a resident of the Commonwealth of Virginia, and he has been an employee of the Department of the Army since July 27, 2004. Plaintiff is a male who, at all relevant times, has been older than 40 years of age.

7. Robert M. Speer is the Acting Secretary of the Department of the Army. He is sued here in his official capacity.

## Facts

### *Background*

8. Before being placed in the Department of the Army under authority of the Department of Defense Priority Placement Program (DoDI 1400.25-V1800), on July 27, 2004, Plaintiff worked full-time for other federal government agencies for nearly two decades.

9. The Department of the Army's U.S. Army Corps of Engineers ("USACE") assigned Plaintiff to the Engineer Research and Development Center ("ERDC"), Topographic Engineering Center's ("TEC") Source Acquisition Team ("SAT") within the Operations Division ("Agency").

10. Unbeknownst to Plaintiff, TEC management presented reasons why they should not have to take Plaintiff as an employee, but they did finally agree, reluctantly.

11. The Agency required employees working on classified information within ERDC/TEC to have Top Secret/Sensitive Compartmented Information ("TS/SCI") security clearances.

12. Many of the employees with TS/SCI clearances worked within a physically separate Sensitive Compartmented Information Facility ("SCIF").

13. Employees who started working at ERDC/TEC without a TS/SCI clearance were assigned to perform unclassified duties in an unclassified space while their clearance applications were processed, which could take up to two years.

14. When Plaintiff started with SAT in 2004, his co-workers in the same organization, in the same spaces, working on the same information on the same physical equipment, and on the same schedule included two less than 40-year-old females, Tisha Kennan and Alana Hubbard; one less than 40-year-old male, Marty Downing; and a female of unknown age, Lauretta Williams.

15. While his TS/SCI clearance application was being processed, from July 27, 2004 until February 9, 2005, Plaintiff was assigned unclassified duties, that is, duties that did not require a security clearance or unescorted access to classified spaces.

16. At the time of Dr. Campbell's appointment, his and Ms. Kennan's TS/SCI clearances had not yet been approved, and so they both worked outside the SCIF. Ms. Hubbard and Mr. Downing were working inside the SCIF.

17. From July 27, 2004 until February 25, 2005, Plaintiff and his co-workers on the SAT, including Ms. Kennan, Ms. Hubbard, and Mr. Downing, frequently had lunch together and would "hang out" in their workspaces.

18. Occasionally, during those lunches and at other off-site social gatherings, Ms. Kennan would remark for no apparent reason that she was a former Marine, a marksman, and a good shot.

19. From time to time during this period (July 27, 2004 through February 25, 2005), Ms. Hubbard and Ms. Kennan would discuss with each other and with their team leader, Ms. Theresa Rasmussen, that they would prefer not to have Plaintiff accompany them to lunch. According to Ms. Rasmussen, they did not tell Plaintiff for fear of hurting his feelings. However, at no time during that period did Ms. Kennan or Ms. Hubbard advise anyone that she was afraid of Plaintiff or feared for her safety, and no one observed Plaintiff behaving in a threatening manner towards anyone or behaving in a manner that caused anyone concern.

20. On February 9, 2005, Plaintiff's TS/SCI clearance was granted, and he was allowed access to and began working in the SCIF.

21. On February 22, 2005, Plaintiff was transferred to the Current Operations Team, Terrain Analysis Branch (TAB) and was assigned duties no longer requiring access to TS/SCI.

*Co-workers' Fabricated Allegations*

22. On February 25, 2005, Plaintiff met Ms. Kennan and Ms. Hubbard in the SCIF prior to lunch to observe their execution of the program on which they were working.

23. Mr. Harwig opened the door to the SAT lab and asked Plaintiff what he was doing there. Plaintiff responded, "Observing," to which Mr. Harwig responded, "Oh," and then left.

24. Ms. Hubbard, Ms. Kennan, and Plaintiff then went to lunch at a public restaurant. During the meal, Ms. Kennan and Ms. Hubbard loudly expounded on their disgust for the Agency and its management. After lunch, they all returned to work and went their separate ways.

25. On that same day, unbeknownst to Dr. Campbell, co-workers Kennan and Hubbard next went to the EEO office and then to Mr. Harwig's office to complain that Plaintiff had been "distracting" them and making them feel "uncomfortable." Prior to February 25, 2005, they had never contemporaneously complained or expressed any concerns about Plaintiff to any of their administrative superiors.

26. On February 25, 2005, without speaking about this matter to Plaintiff, Mr. Harwig had Plaintiff's access to the SCIF removed.

27. On 25 February 2005, at the direction of Mr. Harwig, Ms. Kennan and Ms. Hubbard also met with Plaintiff's team leader, Jeffery Popp, and told him that Dr. Campbell was "interfering" with their work or "bothering" them or "distracting" them.

28. Even though Mr. Harwig had not yet asked Plaintiff about Ms. Kennan's and Ms. Hubbard's allegations, on that same day, February 25, 2005, he directed administrative subordinate Mr. Popp to advise Plaintiff that his access to the SCIF had been removed and that he was to have no further interactions with Ms. Kennan and Ms. Hubbard.

29. On February 28, 2005, Plaintiff's second-level supervisor, Mr. R. Paul Harwig, signed his Memorandum for Record documenting his personal belief that Ms. Kennan had "made reference to instances that sounded to me [Harwig] like stalking."

30. On February 28, 2005, Plaintiff's team leader, Mr. Popp, spoke with Plaintiff, and, as Mr. Popp subsequently testified, neither Ms. Kennan nor Ms. Hubbard told him that she was in fear of physical harm from Plaintiff, nor did they claim he was sexually harassing one or both of them.

31. Plaintiff had no further interaction with Kennan and Ms. Hubbard.

32. On March 1, 2005, defendant suspended Plaintiff's TS/SCI clearance; Plaintiff continued to be assigned unclassified duties and to work in an unclassified space.

33. Plaintiff's supervisors subsequently testified that they had not witnessed any performance or conduct by Plaintiff that caused them any concerns whatsoever, nor did they contemporaneously document any such concerns, nor did they consider Plaintiff to be a threat to national security.  Plaintiff's relationships with his co-workers and superiors had been collegial and cordial, and no one had expressed any contemporaneous concerns about him.  All of his supervisors in both branches and co-workers in both teams had observed Plaintiff to be a good, professional, thorough, and efficient worker who treated his supervisors and co-workers professionally and with respect.

34. On March 7, 2005, Plaintiff wrote to his supervisors to deny any misconduct.  In the same memorandum, he also expressed his security concerns about the two employees' trustworthiness based on their negative comments about Agency management in public at the February 25, 2005 lunch.

35. On March 8, 2005, Mr. Harwig directed Plaintiff's branch chief, Mr. Popp's supervisor, Mr. Charles Lopez, to counsel Plaintiff concerning sexual harassment, which he did.

36. On March 9, 2005, Mr. Harwig interviewed Ms. Kennan and Ms. Hubbard concerning Plaintiff's assertions about security concerns. Plaintiff's co-workers testified that Mr. Harwig had asked Ms. Kennan and Ms. Hubbard directly if they were "a risk to the nation," to which both said "no."  Mr. Harwig was documented to have responded "Great, have a nice day."

37. Mr. Harwig dismissed Plaintiff's assertions as unfounded because, he concluded, Plaintiff was merely upset by being told the two employees did not want to interact with him.

38. Mr. Harwig further concluded that Plaintiff's allegations against Ms. Kennan and Ms. Hubbard indicated that Plaintiff was a security risk.

39. Ms. Kennan and Ms. Hubbard first learned about Plaintiff's March 7, 2005 memorandum raising security concerns about them during their March 9, 2005 interview with Mr. Harwig. Only then did they tell their supervisors for the first time that they felt threatened by Plaintiff.

40. On March 10, 2005, Mr. Harwig advised Plaintiff that he was being investigated for misconduct based on Ms. Kennan's and Ms. Hubbard's allegations and again ordered Plaintiff not to interact with Ms. Kennan or Ms. Hubbard.

41. After Plaintiff was apprised of Ms. Kennan's and Ms. Hubbard's allegations, and after Mr. Harwig told Plaintiff that he was being investigated, Plaintiff brought a recording device to his unclassified work area so that he could have a record of conversations with those individuals because he was concerned they could make further false statements about their conversations with Plaintiff and Plaintiff wanted evidence to support his claims of unlawful discrimination and retaliation.

42. Plaintiff prevailed in his appeal to the DoD Department of Hearings and Appeals (DOHA).

43. DOHA's Administrative Judge Mark Harvey determined that applicable policy did authorize employees, such as Plaintiff, to possess cell phones and other personal electronic devices, such as audio recorders, in the building where Plaintiff worked, except in areas where classified information was being discussed, and to which Plaintiff no longer had access.

44. Mr. Harwig and other Agency managers met with Dr. Campbell and asked him about Mr. Harwig's February 28, 2005 "belief" that he [Mr. Harwig] had heard something that

sounded to him like stalking. Dr. Campbell denied the allegation and advised Mr. Harwig that at the time of the alleged stalking he had been in the Post gym with a co-worker, Ms. Laura Mulholland.

45.     Plaintiff denied having stalked Ms. Kennan and also asserted that he felt threatened by the two employees who had apparently made false allegations against him.

46.     Plaintiff advised Mr. Harwig and the others that he feared for his safety around Ms. Kennan, as she had stated on several occasions that she was "a former Marine, a marksman and a good shot." Mr. Harwig dismissed Plaintiff's concerns and did nothing about Ms. Kennan's comments.

47.     On March 11, 2005, at 4:00 p.m., Ms. Kennan, with assistance and encouragement of Mr. Harwig and other Agency managers, signed a Fairfax County arrest warrant accusing Plaintiff of stalking her after work two days earlier on a public thoroughfare.

48.     Mr. Harwig further instructed his subordinate SAT employees to prepare statements about "incidents" involving Plaintiff, which they did.

49.     On Monday, March 14, 2005, based on the warrant sworn out by Ms. Kennan, Agency security personnel confronted Plaintiff as he arrived at his unclassified work station, took him into custody, interrogated him, paraded him about the building in handcuffs, and then handed him over to Criminal Investigations Division (CID) personnel for further interrogation.

50.     CID summoned two FBI Special Agents (SAs) to interrogate Plaintiff and to investigate Mr. Harwig's allegations against Plaintiff. Those SAs formally reported to Agency's CID "that [they] have no further interest in the case … [and that] the FBI would not investigate." The SAs' report verified that Plaintiff had a recording device, a cell phone with photographic capability, and a "jogger's FM radio receiver.

51. The FBI SAs forensically examined Plaintiff's tape recorder and reported to the CID that he had not recorded any conversations with his supervisors or co-workers.

52. Defendant's deciding official, Mr. Robert Burkhardt, Plaintiff's third-level supervisor, testified that the "evidence" upon which he "relied" to justify his May 27, 2005 decision to suspend Plaintiff indefinitely without pay included "the FBI report, CID reports."

53. From March 14, 2005 until April 27, 2005, when the Agency placed Plaintiff on paid administrative leave, the Agency continued to assign him unclassified duties to perform in unclassified spaces.

54. On March 21, 2005, Mr. Harwig advised Agency personnel that "[t]here is no restriction on [Plaintiff's] access to the unclassified network." Plaintiff's supervisors confirmed that between March 14, 2005 and May 27, 2005, "[Plaintiff's] current duties did not require him to have access to classified information" and that he was performing his duties in an exemplary manner, proactively and thoroughly.

55. On April 27, 2005, Mr. Harwig proposed Plaintiff's indefinite suspension without pay pending adjudication of the matter of his security clearance.

56. On May 5, 2005, Mr. Harwig directly contacted the U.S. Army Central Clearance Facility (CCF) and recommended that it permanently revoke Plaintiff's condition-of-employment security clearance "in the interest of national security."

57. On May 19, 2005, Plaintiff submitted an oral reply to the proposed indefinite suspension to the deciding official, Robert Burkhardt.

58. In that oral reply, Plaintiff raised the issue that he was being discriminated against with respect to the proposal (and subsequent decision) to indefinitely suspend him without pay

9

instead of assigning him unclassified duties or placing him in a position in paid duty status that did not require a security clearance.

59. Plaintiff emphasized that he believed he was being treated differently from Ms. Kennan and Ms. Hubbard, his two female co-workers under the age of 40. He reiterated his knowledge and evidence that Ms. Kennan had fabricated allegations of his wrongdoing and his fear of physical harm from her based on her repeated threats of being a good marksman.

60. Plaintiff also pointed out that all other employees whose clearances had not yet been approved, or had been suspended or revoked, had remained in paid duty status and assigned duties that did not require a security clearance.

61. Defendant had unclassified work that Plaintiff could have performed.

*852-Day Suspension Without Pay*

62. On May 27, 2005, eight days after Plaintiff raised his EEO claims in the oral reply, the Agency's deciding official, Mr. Robert Burkhardt, issued Agency's unprecedented decision to suspend Plaintiff indefinitely without pay, fully supporting Mr. Harwig's proposal, "pending a final determination of the status of your security clearance by the US Army Central Clearance Facility."

63. Mr. Burkhardt's suspension letter cited the stalking arrest and stated that he had considered Plaintiff's claims of discriminatory and disparate treatment, but that those allegations did not concern him because he was confident the EEOC would agree with him that Plaintiff's claims were baseless.

64. On October 19, 2005, Plaintiff was found not guilty of the stalking charge, and all references were ordered expunged from all official records.

65.     On November 16, 2005, Plaintiff advised Mr. Harwig and Mr. Lopez of that fact; however, the Agency refused to allow him to return to work.

66.     On October 4, 2006, Mr. Burkhardt testified that his reason for suspending Plaintiff on May 27, 2005 had been Mr. Burkhardt's personal belief that, instead of the five enumerated reasons in his (Agency's) suspension notice, he had now come to believe that Plaintiff was "not held in high esteem" by unnamed person(s). On December 4, 2012, Mr. Burkhardt reaffirmed that testimony.

67.     On September 5, 2007, the Department of Defense's Office of Hearings and Appeals ("DOHA") determined, based on the same evidence considered by Mr. Burkhardt and Mr. Harwig, that each of the Agency's security clearance allegations against Plaintiff lacked merit.

68.     Plaintiff remained on indefinite suspension without pay for 852 days until the Agency restored his clearance effective September 26, 2007.

69.     On September 26, 2007, the CCF issued its final determination of the status of Plaintiff's security clearance, fully reinstating it effective that date.

70.     On November 5, 2007, Plaintiff met with Mr. Burkhardt and discussed the financial ramifications of the suspension.

71.

*Administrative Exhaustion*

72.     On August 4, 2005, Plaintiff filed a formal EEO complaint alleging that he was subjected to discrimination based on sex and age, subsequently amended to include reprisal, for protected EEO activity when the Agency indefinitely suspended him from his position without pay on May 27, 2005, pending a determination of his security clearance.

11

73. After receiving the EEOC's Report of Investigation, Plaintiff requested a hearing.

74. A hearing was held before an EEOC Administrative Judge on December 3, 4, and 5, 2012, and the parties submitted closing briefs on February 28, 2013.

75. On January 13, 2014, the presiding EEOC Administrative Judge found Plaintiff to be the prevailing party.

76. On March 19, 2014, the same Administrative Judge, in the absence of any new law, precedent, or evidence, reversed his finding and issued a decision in favor of the Agency.

77. On April 1, 2014, the Agency adopted the Administrative Judge's second decision.

78. Plaintiff appealed the decision to the EEOC's Office of Federal Operations ("OFO"). On December 2, 2016, the OFO affirmed the Agency's final action implementing the Administrative Judge's decision finding no discrimination.

79. This action is timely filed within 90 days of receipt of the December 2, 2016, OFO decision.

### COUNT I
**Disparate Treatment**
*Title VII of the Civil Rights Act*
*Age Discrimination in Employment Act*

80. All other allegations of this pleading are incorporated here by reference.

81. Plaintiff is a male and, at the time of his suspension, he was 57 years old.

82. The Agency treated Complainant in an adverse manner when it placed Plaintiff on an indefinite, unpaid suspension instead of allowing him to continue working on unclassified tasks.

83. Others outside Plaintiffs' protected classes were treated better in similar situations.

84.     No action was taken against Ms. Kennan or Ms. Hubbard, both females under the age of 40, for their false allegations and threatening comments.

85.     The defendant permitted other employees whose security clearances had been suspended or revoked were permitted to perform unclassified duties or placed them on administrative leave with pay.

86.     Thus, Defendant engaged in unlawful age and sex discrimination.

87.     Based on the above, Defendant violated the ADEA, 29 U.S.C. §§ 621, *et seq*. and Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e-2, *et seq*.  As a direct and proximate result of Defendant's conduct as set forth, Plaintiff has suffered actual and compensatory damages, including back pay, front pay, and loss of benefits within the jurisdictional limits of this Court. Plaintiff will further show that Defendant's conduct as alleged was willful, entitling Plaintiff to additional liquidated damages as well as any additional damages to the extent provided under the ADEA and Title VII.

## **COUNT II**
### **Retaliation**
*Title VII of the Civil Rights Act*
*Age Discrimination in Employment Act*

88.     All other allegations of this pleading are incorporated here by reference.

89.     Title VII and ADEA prohibit an employer from discriminating against any of its employees because the employee has opposed an unlawful discriminatory practice, or because the employee has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII or ADEA.

90.     Defendant engaged in unlawful reprisal when it refused to consider and investigate Plaintiff's claims of age and sex discrimination that were presented to Agency management before it placed him on indefinite suspension without pay.

91.     The Agency specifically noted in its letter placing Plaintiff on indefinite suspension without pay that it did not believe his EEO claims and that it believed the EEOC would rule in its favor.

92.     Based on the above, Defendant violated the ADEA, 29 U.S.C. §§ 621, *et seq.* and Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e-2, *et seq.*  As a direct and proximate result of Defendant's conduct as set forth, Plaintiff has suffered actual and compensatory damages, including back pay, front pay, and loss of benefits within the jurisdictional limits of this Court. Plaintiff will further show that Defendant's conduct as alleged was willful, entitling Plaintiff to additional liquidated damages as well as any additional damages to the extent provided under the ADEA and Title VII.

## COUNT III
### Retaliation
*Whistleblower Protection Act, 5 U.S.C. § 2302*

93.     All other allegations of this pleading are incorporated here by reference. Plaintiff's disclosures, participation and other protected activities ("activities") were a contributing factor in Defendant's personnel actions taken or to be taken against Plaintiff.

94.     Plaintiff's activities are protected by the Whistleblower Protection Act (WPA), 5 U.S.C. § 2302.

95.     From 2005 through the present, Defendant's officials knew of Plaintiff's disclosures and other protected activities.

96.     Defendant's personnel actions occurred in the midst of Plaintiff's protected participation in official proceedings and a reasonable person could conclude that the disclosures or other protected activities were a contributing factor in the personnel actions.

97. Defendant's adverse actions against Plaintiff caused damages including loss of pay and promotion, loss of reputation, anxiety, humiliation, upset, anguish and distress.

98. Plaintiff's claims of reprisal in violation of WPA can be appealed to the Merit Systems Protection Board MSPB. 5 U.S.C. § 1214(a)(3).

99. Plaintiff's claims are "mixed" in that they include both discrimination and whistleblower claims.

100. Plaintiff satisfied all administrative prerequisites to institute this action here.

101. Pursuant to WPA, 5 U.S.C. §§ 1221 and 7702, Plaintiff is entitled to corrective action, including but not limited to being placed, as nearly as possible, in the position he would have been in had the prohibited personnel practices not occurred, back pay and related benefits, any other reasonable and foreseeable consequential damages, and compensatory damages (including interest, reasonable expert witness fees, and costs).

## PRAYER FOR RELIEF

Dr. Campbell seeks the following relief:

A. Declaratory relief that the acts and practices described in this complaint are unlawful in violation of Title VII and the ADEA

B. Preliminary and permanent injunctive relief to restore him as nearly as possible to the position he would have held had the prohibited personnel practices not occurred

C. Equitable relief to ensure that Defendant's workplaces are free from unlawful discrimination and retaliation by directing Defendant to take such affirmative action as is necessary to ensure that the effects of those unlawful employment

       practices are eliminated and do not continue to affect Plaintiff's employment and advancement opportunities

D.      Back pay plus interest and related benefits, medical costs incurred, travel expenses, and any other reasonable and foreseeable consequential damages

E.      Compensatory damages (including interest, reasonable expert witness fees, and costs)

F.      Costs of this action, including reasonable attorneys' fees

G.      Such other and further relief this Court finds just and proper.

                                                  Respectfully submitted,

Date: February 28, 2017                      /s/ Richard R. Renner_____
                                                  Richard R. Renner, OH0021
                                                  rrenner@kcnlaw.com
                                                  Kalijarvi, Chuzi, Newman & Fitch, P.C.
                                                  1901 L St. NW, Suite 610
                                                  Washington, DC  20036
                                                  (202) 331-9260 office
                                                  1-877-452-5789 fax

                                                  *Attorney for Plaintiff*

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

                                                  Respectfully submitted,

                                                  /s/ Richard R. Renner_____
                                                  Richard R. Renner, OH0021
                                                  *Attorney for Plaintiff*